1        **TRANSCRIBED FROM DIGITAL RECORDING**

2            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
3                    EASTERN DIVISION

4    UNITED STATES OF AMERICA,          )
                                        )
5                    Plaintiff,         )
                                        )   Case No. 14 CR 705-3
6    -vs-                               )
                                        )   Chicago, Illinois
7    ALEXANDER FIGUEROA,                )   6-11-15
                                        )   2:38 PM
8                    Defendant.         )
                                        )
9
                    TRANSCRIPT OF PROCEEDINGS
10   BEFORE THE HONORABLE SIDNEY I. SCHENKIER, MAGISTRATE JUDGE

11   APPEARANCES:

12   For the Government:      HON. ZACHARY T. FARDON
                             UNITED STATES ATTORNEY
13                           BY:  MS. GEORGIA ALEXAKIS
                             219 South Dearborn Street, Room 500
14                           (312) 353-8897
                             E-mail: Georgia.alexakis@usdoj.gov
15
     For the Defendant:       LAW OFFICES OF RASCIA & HIMEL, LTD.
16                           MR. FRANK J. HIMEL
                             650 North Dearborn Street, Suite 700
17                           Chicago, IL 60654
                             (312) 643-0855
18                           E-mail:  Frankhimel@gmail.com

19       **PLEASE NOTIFY OF INCORRECT SPEAKER IDENTIFICATION**
         NOTE:   FAILURE TO STAND NEAR THE MICROPHONE MAKES
20              PORTIONS UNINTELLIGIBLE AND INAUDIBLE.

21   Transcriber:
                     Sandra M. Tennis, CSR, RPR, RMR, FCRR
22                      Official Court Reporter
                     United States District Court
23               219 South Dearborn Street, Suite 2260
                     Chicago, Illinois  60604
24                  Telephone:  (312) 554-8244
                 Sandra_Tennis@ilnd.uscourts.gov

25

1           (Proceedings heard in open court:)

2               THE CLERK:  Case No. 14 CR 705-3, USA versus

3     Alexander Figueroa, motion hearing.

4               MS. ALEXAKIS:  Good afternoon, Judge.  Georgia

5     Alexakis, representing the United States.

6               MR. HIMEL:  Good afternoon, your Honor.  My name is

7     Frank Himel, H-i-m-e-l.  I represent Mr. Figueroa.

8               THE COURT:  Good afternoon.  Good afternoon,

9     Mr. Figueroa.

10              THE DEFENDANT:  Good afternoon, your Honor.

11              THE COURT:  We're here on the defendant's motion to

12    set conditions of bail.  There is a pretrial services report

13    back in January and there was a supplement to that that was

14    prepared and I think filed today.  Has everybody had a chance

15    to look at that?

16              MR. HIMEL:  Yes, sir.

17              MS. ALEXAKIS:  Yes, Judge.

18              THE COURT:  Okay.  So how do you wish to proceed?

19              MS. ALEXAKIS:  The government contests --

20              THE COURT:  By proffer?

21              MS. ALEXAKIS:  By proffer, yes.

22              THE COURT:  Okay.  So, go ahead, we'll hear from

23    the government.

24              MS. ALEXAKIS:  Sure, Judge.  The government seeks

25    to keep the defendant detained, based on the fact that the

1   government believes that he represents both a risk of flight,
2   as well as danger to the community.  And I know that the
3   Court has some familiarity with this case based on the fact
4   that you reviewed the -- and signed off on the underlying
5   complaint, as well as related search and seizure warrants.
6   But just as a quick refresher, Mr. Figueroa was charged
7   following a lengthy Title III investigation that law
8   enforcement conducted into the Chicago Cell of Mexico's
9   Guerreros Unidos Cartel.  And as a result of that
10  investigation, in December, there was -- eight defendants
11  were charged by criminal complaint.  In March, a Grand Jury
12  returned two indictments against nine defendants.
13  Mr. Figueroa is named in one of those indictments where --
14  along with seven of his co-conspirators.  It was a 28-count
15  indictment.  Mr. Figueroa is named in -- I believe it's eight
16  of those counts.
17          And so, as an initial matter, the government points
18  out, as I believe defendant concedes, that this is a
19  presumption case under Section 3142; that there is a
20  presumption here that Mr. Figueroa be detained and that there
21  isn't any conditions of release that would reassure the Court
22  and the government that he would appear for subsequent court
23  proceedings.
24          Just taking you through the 3142 factors that the
25  Court should consider in deciding defendant's motion, the

1    government notes, again, the nature of the offense.  This is

2    a serious offense and the government -- from the government's

3    standpoint, the indictment brought against Mr. Figueroa and

4    his co-conspirators allege a number of -- the basic offense

5    is a drug distribution conspiracy.  Mr. Figueroa is named as

6    a co-conspirator.  He is named in six additional counts under

7    Section 841 for either possessing narcotics with the intent

8    of distributing them or, in fact, distributing those

9    narcotics.  There is also a phone count that has been brought

10   against Mr. Figueroa.  At a minimum, he is facing 10 years in

11   prison.  That's the mandatory minimum based on the charges

12   that he is facing.

13              And the evidence, which is another factor that the

14   Court should consider in deciding this motion, the weight of

15   the evidence includes extensive Title III -- this is a

16   Title III investigation.  So we have the defendant's own

17   statements recorded over the phone, speaking with his

18   co-conspirators, arranging for the pickup and delivery of

19   narcotics and narcotics-related proceeds.  We have a

20   confidential source who was heavily involved in the

21   investigation and who had recorded conversations, meetings,

22   with the defendant.  We have physical surveillance that law

23   enforcement conducted, as well as extensive pole camera

24   surveillance video that showed the defendant operational at

25   two warehouses maintained by the lead defendant in this

1    matter, Pablo Vega Cuevas.  And, in that capacity, was

2    managing, supervising other members of the conspiracy as they

3    were making narcotics-related deliveries and pickups.

4         The amount of narcotics involved in this case is

5    extensive.  I've quickly looked through, you know, the

6    underlying evidence before I came up this morning.  And just

7    off the cuff, the government believes that it can tie

8    Mr. Figueroa to the delivery of at least 56 kilos of heroin

9    in the Chicagoland area.

10        And then when I look to the final characteristic --

11   or the final factor that the Court looks at under 3142, the

12   defendant's characteristics, I think it's important to note

13   the same way that pre-trial services already has that the

14   defendant has strong ties to Mexico.  He travels there

15   annually.  He was, in fact, arrested in Oklahoma while he was

16   on his way to Mexico with Mr. -- Mr. Vega, the lead defendant

17   in this matter.

18        And I would just also like to touch upon the

19   inappropriateness, at least from the government's

20   perspective, of the conditions of release the defendant has

21   proposed.  First and foremost, he hasn't proposed any --

22   posting any property or anything by means of -- by way of

23   security.  That is something that pretrial services has

24   recommended, based on their assessment of the defendant's

25   situation.

1          I think it's also important to note that, of his

2    co-defendants, we have seven co-defendants who have been

3    arrested as a result of the government's charges, three of

4    whom remain detained, two of whom have posted property.  One

5    defendant posted -- well, he secured his release of the

6    $200,000 bond --

7          THE COURT:  That was Mr. Sanchez?

8          MS. ALEXAKIS:  Mr. Sanchez, correct.  And he posted

9    property and $75,000 in cash.

10         And then another defendant, Isaias Mandujano,

11   posted two properties in order to secure his release.  So I

12   don't think --

13         THE COURT:  Well, of the ones detained, two of them

14   waived; right?

15         MS. ALEXAKIS:  I believe all three waived.

16         THE COURT:  I couldn't tell with Mr. Cuevas.

17         MS. ALEXAKIS:  I believe, your Honor, all three

18   waived; but with the idea that, if they could come up with

19   something, they would come back.

20         THE COURT:  So the two bonds you've mentioned are

21   both -- were both secured bonds?

22         MS. ALEXAKIS:  Correct.

23         THE COURT:  As to the one defendant, the case was

24   terminated against him; right?

25         MS. ALEXAKIS:  No.

1        THE COURT:  Was that separate?

2        MS. ALEXAKIS:  The last defendant is Armando

3   Macias.

4        THE COURT:  Mandujano.

5        MS. ALEXAKIS:  Mr. Mondujano, the case was

6   dismissed --

7        THE COURT:  Yeah.

8        MS. ALEXAKIS:  The complaint was dismissed against

9   him, but he was charged actually under a different CR number.

10  But he has posted two properties.

11       THE COURT:  Okay.

12       MS. ALEXAKIS:  So, right, there is no property

13  here.  The custodian that's proposed is a woman by the name

14  of Christina Pena.  My understanding is that -- and I'm not

15  entirely sure whether the defendant intends to live with

16  Ms. Pena or if he intends to live with his girlfriend in

17  Aurora.  The pretrial services report from today suggests

18  that the plan is that he live with his girlfriend, Blanca

19  Vega, in Aurora.  If that's the case, the government objects

20  to that setup.  It's difficult, obviously, for someone to act

21  as a custodian for a defendant when they're not even at the

22  same location.

23       THE COURT:  The supplemental report does say that,

24  that Ms. Pena would be willing to have and live there, if

25  that was what was required.

1      MS. ALEXAKIS:  And if that's the case, the

2   government still has concerns with Ms. Pena.  My

3   understanding, I could be wrong about this, but the

4   government's understanding is that Ms. Pena's house is Alex

5   Pena.  He lives in the home as well.  He has a prior

6   narcotics-related conviction on his record.

7      There was a vehicle that was involved in the

8   criminal conspiracy the government has charged that had a

9   trap in it the law enforcement believes was used to transport

10  narcotics and narcotics-related proceeds.  That vehicle was

11  found at Ms. Pena's home.  And so, given those two factors,

12  the government has questions about the suitability of

13  Ms. Pena as a custodian.

14      If the defendant, in fact, wants to live in Aurora

15  with his girlfriend, Blanca Vega, the government has even

16  more serious concerns about that, given that Ms. Vega remains

17  a subject of the government's ongoing investigation.

18      So based on those factors, your Honor, the

19  government believes that Mr. Figueroa should remain detained.

20      MR. HIMEL:  Thank you.  Your Honor, I did concede

21  the seriousness of the offense.  I offered, in my written

22  motion, I thought, a number of things about Mr. Figueroa that

23  made him worthy of the Court's trust:  A relative lack of

24  criminal history, prior military service.  I see the ties

25  contrary.  He is a US citizen.  Certainly he is of Mexican

1    origin and certainly he would have relatives in Mexico.  But

2    his ties are -- are to the Northern District, whether it's in

3    Chicago, Illinois or to Joliet.  And I think that the

4    thing -- what I could offer the Court, outside of what's in

5    the written motion and the, really, the proof of the ties is

6    the turnout for court today.  I was pleasantly surprised when

7    I turned the corner when I see so many loved ones.  It says a

8    lot.  It says there is people there that are going to -- that

9    truly are concerned about him and truly are not -- he is not

10   going to be a flight risk with these folks here.  When the

11   government talks about flight risks, they're talking in

12   generalities just because he has traveled to Mexico.

13          When we talk about danger to the community, I think

14   we're talking generalities, too.  Certainly there is

15   ancillary effects of narcotics that involve violence; and

16   everyone is aware of those.  But there is nothing that's

17   specific to Mr. Figueroa.  So I don't think that there is any

18   reason to believe he is a flight risk.  And I don't think

19   there is any reason to believe he is any danger to anyone.

20   And I think that, if he was on electronic monitoring at

21   Christina Pena's house, I think that would be appropriate.

22   And she herself is an appropriate third party.

23          If -- the real estate, why I'm here now and not

24   when he was originally arrested, I investigated properties.

25   There is a lot of people out here, people who are willing to

1    help.  The problem was, the targeted properties didn't have

2    enough equity to even make it worth the Court's while to

3    consider.  And so I wish -- I wish we had a piece of property

4    to secure his release, but I don't.  I wish I did, but I

5    don't.

6            THE COURT:  The pretrial services report from

7    January says that Mr. Figueroa's mother, sister and

8    grandmother each own their residences.

9            MR. HIMEL:  To property that I -- that I

10   investigated had $5,000 or --

11           THE COURT:  No, but I'm just saying, is that the

12   case?

13           MR. HIMEL:  There was -- any property that was

14   brought to my attention was something that didn't have any

15   equity.

16           THE COURT:  I understand that, but I'm actually

17   thinking about something different.

18           MR. HIMEL:  I didn't --

19           THE COURT:  So the property that you investigated,

20   whose property is it?

21           MR. HIMEL:  That's the one on Karlov, the property

22   where we are requesting to -- to reside for --

23           THE COURT:  So that's --

24           MS. ALEXAKIS:  His sister.

25           THE COURT:  -- Ms. Pena's?

```
 1              MR. HIMEL:  Yes, sir.

 2              THE COURT:  Okay.  And that's where she lives?

 3              MR. HIMEL:  Yes, sir.

 4              THE COURT:  It's her home?

 5              MR. HIMEL:  Yes, sir.

 6              THE COURT:  And the property that pretrial services

 7   said that his mother and sister, and I guess it's reporting

 8   what Mr. Figueroa said, is that where they live?  Is it a

 9   home?

10              MR. HIMEL:  I don't know the answer to that.  We

11   have a number of family members that I'm sure could answer

12   that, the specifics of that.

13              THE COURT:  Okay.  Well, maybe you could find out

14   for me.

15              MR. HIMEL:  Thank you.  The specific property?

16              THE COURT:  I'd like -- the pretrial services

17   report said that Mr. Figueroa's mother and grandmother, in

18   addition to the sister, own their residences.  And I'd like

19   to know if, in fact, they own their residences and is it, in

20   fact, that's where they live.

21              MR. HIMEL:  Who wants to speak on that?  Can I

22   introduce the witness to the Court?

23              MS. EUREKA:  Hello, your Honor.  My name is Eva

24   Eureka. (Phonetic.)

25              THE COURT:  What is your relationship to the --
```

1    MS. EUREKA:  I am his aunt.

2    THE COURT:  His aunt, okay.  Well, I was interested

3    because there was a statement in one of the reports I had

4    that Mr. Figueroa's mother and grandmother each own property.

5    MS. EUREKA:  Yes.

6    THE COURT:  And they do?

7    MS. EUREKA:  Yes.  His mother is right here.

8    THE COURT:  Yeah.  Is that where they live?

9    MS. EUREKA:  He could live with us, yes.

10    THE COURT:  No, no, no, no.

11    MS. EUREKA:  Is that where he lives?

12    THE COURT:  No, no, no, no, no, no.  So the mother

13    owns property?

14    MS. EUREKA:  Yes.

15    THE COURT:  Is that her residence?

16    MS. EUREKA:  Yes.

17    THE COURT:  She lives there.  How long has she

18    lived there?

19    MS. EUREKA:  About -- I'm going to say about

20    30 years she had her place.

21    THE COURT:  And the grandmother owns the place

22    where she lives?

23    MS. EUREKA:  She owns her property, too, yes, my

24    mother.

25    THE COURT:  And how long has she lived there?

1           MS. EUREKA:  Since the '70s.

2           THE COURT:  All right.  Well, that's what I was

3    interested in finding out.  Since I'm finding out about

4    everybody's property, do you own property?

5           MS. EUREKA:  I live with my mother.  It's her

6    building.  But my nephew will not go no where.  He could live

7    with us.  I mean, there is --

8           THE COURT:  His lawyer is making, you know, the

9    arguments.

10          MS. EUREKA:  Okay.  Yes.

11          THE COURT:  I just need to know some information

12   from you.

13          MS. EUREKA:  Yes.  Okay.

14          THE COURT:  Thank you very much.

15          MS. EUREKA:  Thank you.

16          MR. HIMEL:  Thank you.

17          THE COURT:  Okay.  Is there anything else --

18          MR. HIMEL:  I don't have anything else.

19          THE COURT:  -- Mr. Himel?

20          MR. HIMEL:  No, sir.

21          MS. ALEXAKIS:  Your Honor, only that if the Court

22   is inclined to use any of these residences as -- to secure a

23   bond for Mr. Figueroa, the government would need additional

24   time to do research into those properties and see what value

25   is in there.

1          THE COURT:  Of course.  Of course.  I understand.

2          Well, the government is correct that this is a

3    presumption case.  That means that there is a presumption

4    that you would be kept in custody, Mr. Figueroa, and that the

5    burden would be on you to show that you shouldn't.  Now, the

6    presumption can be rebutted.  I think the evidence that I've

7    seen is sufficient to rebut the presumption in terms of ties

8    to Chicago, prior military service, history of gainful

9    employment, a courtroom full of people demonstrating that

10   there are ties to Chicago.

11         So what that means is that we look to whether the

12   government has demonstrated that, by a preponderance of the

13   evidence, you are a serious risk of flight; by clear and

14   convincing evidence, you are a danger to the community; and

15   that conditions of release would not reasonably protect

16   against those risks.

17         The fact that the presumption has been rebutted

18   doesn't mean that it's irrelevant that this is a presumption

19   case.  It is still a factor that I consider, if you will, a

20   little bit of a thumb on the scale that weighs in the

21   government's favor.

22         So when I consider those various factors, the

23   nature and circumstances of the offense charged, it is a

24   serious offense.  You are charged in eight counts.  If

25   convicted, you would face, you know, a very serious sentence.

1   And that reflects the determination by Congress that this

2   kind of activity is very dangerous and serious activity.  And

3   I guess in particular because it involves heroin.  And that's

4   not to endorse any other particular drug, but I think heroin,

5   in particular, has -- there is a lot of evidence about what

6   scourge that is and how, when people are addicted to that,

7   it's a very serious addiction and very damaging addiction.

8   So it's a serious offense.  It's a serious offense.

9         It's an offense that also I think, for the reasons

10   that Mr. Himel described, does involve danger.  And it's not

11   simply that it's a danger to people who may be affected by

12   use of drugs, but, you know, the drug trade has certainly

13   document evidence of violent activities associated with it.

14         Now, there is no evidence that I've seen of you

15   engaging in violent activity.  But that doesn't mean it's not

16   dangerous activity.  So, you know, bank robbery is dangerous

17   activity, even if the person goes into the bank and doesn't

18   have a gun, because it sets off a chain of events that can

19   put people at danger.  What if a police officer comes?  What

20   if there is a chase?  What if somebody who is just a

21   bystander gets injured?  So the fact that you were not

22   yourself, from anything I see, engaged in violent activity,

23   doesn't mean it wasn't dangerous activity.  So that's

24   something that I weigh into the equation here.

25         The weight of the evidence.  Certainly the

1    government offered through the affidavit in support of the

2    original complaint a lot of evidence from interceptions of

3    conversations, confidential sources.  And so I take that into

4    consideration.  Now, at the same time that I do, I don't give

5    that the highest weight because you have the presumption of

6    innocence.  And certainly you are entitled to that

7    presumption.  And I give you that presumption.  What I have

8    to do, though, in a hearing such as this, is I have to decide

9    whether, or notwithstanding the presumption of innocence, you

10   should be kept in custody while waiting for the case to be

11   decided.  If I weigh too heavily on the weight of the

12   evidence, I think that there is a risk of compromising that

13   presumption of innocence.  So it is something that I'm

14   mindful of.  I give it some consideration, but I don't place

15   the heaviest weight on that.

16            I consider the seriousness of the danger that you

17   might present to the community, and I look at that in a

18   couple dimensions.  One is with respect to the conduct that's

19   alleged here.  And I've already described how I view that.

20            Another is then looking at your general background

21   to see if there is other things in your background that would

22   show that you present some danger.  There, I really don't see

23   anything that does.  I don't see, you know, certainly a

24   meaningful criminal record.  There is the guilty plea to a

25   theft in 2000, but nothing that reflects danger.  I don't see

1    other evidence of engaging in fights.  You know, other kinds
2    of dangerous activity.  I know that you own a firearm, but
3    you have a, you know, FOID card for that.  So I think -- I
4    look at that factor, and I don't think it really adds to the
5    danger equation.

6            And then I look at your background history and
7    characteristics.  And, you know, there is a lot of good
8    that's there.  Obviously you have strong ties to Chicago.  As
9    I mentioned, you have a work history.  I don't see evidence
10   of any kind of drug use or mental health problems that would
11   create instability that could result in, you know, dangerous
12   behavior if you're on bond.  As I say, no, you know, criminal
13   history.

14           Now, what I do see is I think evidence, when I look
15   at the seriousness of the charge, and I see that certainly
16   principle ties are not to Mexico, they are to Chicago, that's
17   what I see.  But the prospect of potentially a very serious
18   sentence, plus evidence that one might view as significant at
19   this point.  Obviously the whole evidentiary tale has not
20   been written.  That can create an incentive to flee,
21   notwithstanding ties.  Because if somebody thinks they're
22   going to go to prison for a long time, those ties become
23   maybe less significant.

24           I see an allegation in a proffer that, when you
25   look at all of the alleged transactions, there is evidence

1   that ties Mr. Figueroa to very substantial movement of large

2   quantities of heroin, which involve lots of exchange of

3   dollars, which means he may have access, apart from what's

4   reflected in the pretrial services report concerning the

5   resources of his girlfriend and himself, you know, through

6   their employment to, you know, assets that would facilitate

7   funds.  So I take that into consideration in finding if there

8   is here a significant serious risk of flight.

9        You know, I think that, with respect to danger,

10  it's a much closer case.  But because I'm finding risk of

11  flight, I don't need to pass on whether there is the danger

12  to the community.  But I do think that very significant bond

13  restrictions are important.

14       I do agree with the various conditions that are set

15  forth in the pretrial services report, including a secured

16  bond.  And I recognize the proffer that at least the one

17  property, Mr. Figueroa's sister's property, doesn't have

18  equity.  I don't know what the equity might be in the

19  property of Mr. Figueroa's mother or grandmother.  It's

20  represented that they've been there a long time.  There may

21  not be any mortgages on them.  And if they were bought many,

22  many years ago, notwithstanding the events of 2008, you know,

23  they may have more value than they had when they were

24  purchased.  So I think that that's a fit subject for inquiry.

25       But I would say this:  Whatever the equity is in

1  the properties, the reason I was asking about the nature of
2  the properties is because, apart from monetary equity, there
3  is kind of a personal equity in a home that you've lived in
4  for 30 years, 40 years and maybe you raised families in.
5  People are very attached to homes.  And I think that there is
6  a certain, what I would call, moral equity that's involved if
7  the properties are all posted.  And even if they would not be
8  enough to satisfy the bond that I would set, that
9  Mr. Figueroa should know, and his sister should know, and his
10  mother should know, and his grandmother should know that, if
11  he violated conditions that caused the bond to be forfeited,
12  that they would, each one of them, would lose the house that
13  they live in.  Each one of them.

14          So what I would say is that I would require a
15  $200,000 bond.  I would require the sister, the mother and
16  grandmother to post their homes as security for the bond.
17  And even if it doesn't secure all of it or even a substantial
18  part of it for the reasons I've described, I think that that
19  would be important.  So I would require that.  Given the
20  government's proffer, I think the place of residence should
21  be Ms. Vega.

22          MS. ALEXAKIS:  Ms. Vega or Ms. Pena, Judge?
23          THE COURT:  I'm sorry, Ms. Pena.  Ms. Pena.  Thank
24  you.  And the defense proposal is that there be home
25  detention with electronic monitoring.

1       MR. HIMEL:  Yes, sir.

2       THE COURT:  Okay.  With him to be able to leave to

3    go to work.  One question I had about the work.  The pretrial

4    services report from January said that, you know,

5    Mr. Figueroa has a small business, that he is a co-owner of

6    it.  Is the business still functioning?

7       MR. HIMEL:  I think that, when you're running your

8    own business, we should establish that this business is

9    operational before you give him permission to move.

10      THE COURT:  Right.  Right.  So what I'd like -- so

11   we're going to need some time to let the government do its

12   search into the property and get the papers together.  So, in

13   that time, you can also determine whether the business is

14   still ongoing so we know whether there would be that

15   employment to have.  Because that would be relevant to me in

16   determining whether he would be able to go out for

17   employment, or at least for that employment.

18      MR. HIMEL:  That's understood.

19      THE COURT:  So how long do you want to kind of sort

20   that out, the property, the employment?

21      MS. ALEXAKIS:  It depends on when the defendant can

22   provide the government with the information about the

23   relevant properties.

24      THE COURT:  Or the family.

25      MR. HIMEL:  I would -- one to two weeks would be

1    sufficient.

2    THE COURT:  Okay.  We could -- a week would be next

3    Thursday.  We could set it for next Friday, or we could set

4    it for the following week.  Whatever you feel most

5    comfortable with.

6    MS. ALEXAKIS:  I am -- I will be out of the country

7    from the 20th through July 3rd.  So next Saturday through the

8    following two weeks, and then I return to a trial.

9    MR. HIMEL:  So when is your last day?

10   MS. ALEXAKIS:  I'm out basically the 20th through

11   the Fourth of July.

12   THE COURT:  You'll be here through the 19th.

13   MR. HIMEL:  Friday the 19th.

14   THE COURT:  Do you want to set it that day?

15   MR. HIMEL:  I would be available.

16   MS. ALEXAKIS:  That will be fine.

17   THE COURT:  Okay.  All right.  Jenny, what time can

18   we do Friday the 19th of June?

19   Can we do it 2:30 on Friday?

20   MS. ALEXAKIS:  That works for the government.

21   THE COURT:  Does that work for you, Mr. Himel?

22   MR. HIMEL:  Yes, sir.

23   THE COURT:  June 19th, 2:30.  All right.

24   MR. HIMEL:  Thank you.

25   THE COURT:  So, Mr. Figueroa, you understand that

1   I've indicated that there are conditions that I think would
2   be appropriate for your release on bond, but some time needs
3   to pass so that the paperwork can get together, the
4   government can make sure that the properties are, in fact,
5   owned, that the title is clear, that there is not other
6   co-owners who need to be brought into this, and for some --
7   for us to -- for me to have better information about what the
8   employment would be that you could go back to.  All right?
9   You can certainly talk to Mr. Himel about that.  He can, you
10  know, follow that up.  The government can do what inquiry it
11  would like to do, and then I'll have that information.
12          So you are going to be kept in custody until then,
13  and then you will be brought back here for further hearings
14  on the 19th.
15          THE DEFENDANT:  I appreciate it.
16          THE COURT:  Okay?
17          THE DEFENDANT:  Yes, your Honor.
18          THE COURT:  All right.  Anything further?
19          MS. ALEXAKIS:  No, Judge.
20          MR. HIMEL:  Thank you, your Honor.
21          THE COURT:  All right.  And in terms of who comes
22  from the family the next time, everybody is always welcome,
23  it's a public courtroom, but I do need to have anybody who
24  would be a third-party custodian, who would be Ms. Pena.  And
25  I would need people who are cosigning and, you know,

1    quitclaiming property so I can talk to them.  All right?

2              MR. HIMEL:  Thank you, your Honor.

3              MS. ALEXAKIS:  Thank you, your Honor.

4              THE COURT:  Thanks very much.

5         (Which were all the proceedings heard.)

6                         CERTIFICATE

7         I certify that the foregoing is a correct transcript

8    from the digital recording of proceedings in the

9    above-entitled matter to the best of my ability, given the

10   limitations of using a digital-recording system.

11

12   */s/Sandra M. Tennis*              *July 8, 2015*

13   _____        _____

14   Sandra M. Tennis                Date
     Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25