UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

MAY 05 2016
S-5-16
Judge Gary Feinerman
United States District Court

UNITED STATES OF AMERICA

v.

ALEXANDER FIGUEROA,
a/k/a "Maddog" and "Spongebob"

No. 14 CR 705-3

Judge Gary Feinerman

## PLEA AGREEMENT

1.     This Plea Agreement between the United States Attorney for the Northern District of Illinois, ZACHARY T. FARDON, and defendant ALEXANDER FIGUEROA, and his attorney, FRANK HIMEL, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(c)(1)(A), as more fully set forth below. The parties to this Agreement have agreed upon the following:

## Charges in This Case

2.     The indictment in this case charges defendant with conspiracy to possess with intent to distribute and distribute one kilogram or more of heroin, in violation of Title 21, United States Code, Sections 841(a)(1) and 846 (Count 1), unlawful use of a communication facility, in violation of Title 21, United States Code, Section 843(b) (Count 8), possession with intent to distribute one kilogram or more of heroin, in violation of Title 21, United States Code, Section 841(a)(1) (Counts 15 and 16), and distribution of one kilogram or more of heroin, in violation of Title 21, United States Code, Section 841(a)(1) (Counts 22, 24, 25 and 27).

3.     Defendant has read the charges against him contained in the indictment, and those charges have been fully explained to him by his attorney.

4.     Defendant fully understands the nature and elements of the crimes with which he has been charged.

## Charge to Which Defendant Is Pleading Guilty

5.     By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the following count of the indictment: Count 1, which charges defendant with conspiracy to knowingly and intentionally possess with intent to distribute and distribute a controlled substance, namely, one kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846. In addition, as further provided below, defendant agrees to the entry of a forfeiture judgment.

## Factual Basis

6.     Defendant will plead guilty because he is in fact guilty of the charge contained in Count 1 of the indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt, and establish a basis for forfeiture of the property described elsewhere in this Plea Agreement:

Beginning no later than 2013, and continuing until in or about October 2014, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant ALEXANDER FIGUEROA conspired with Pablo Vega Cuevas, Arturo Martinez,

Roberto Sanchez, Eliseo Betancourt-Pereira, Santos Wilfredo Sorto Hernandez, Jose Rodriguez, and others known and unknown to knowingly and intentionally possess with intent to distribute and to distribute a controlled substance, namely, one kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846.

More specifically, beginning in or around 2013 and continuing until at least in or around October 2014, FIGUEROA agreed with Pablo Vega Cuevas, Arturo Martinez, Roberto Sanchez, Eliseo Betancourt-Pereira, Santos Wilfredo Sorto Hernandez, Jose Rodriguez, and others – all members of the Vega drug trafficking organization - to import wholesale kilogram quantities of heroin from Mexico into the United States for distribution in and around the Chicago area. FIGUEROA agreed to deliver kilogram quantities of narcotics to various wholesale customers of the Vega DTO, including Roberto Sanchez and Jose Rodriguez. FIGUEROA also agreed to pick up and deliver narcotics proceeds on behalf of the Vega DTO.

At Vega's direction, FIGUEROA, Betancourt-Pereira and Sorto Hernandez also unloaded narcotics that were hidden in concealed compartments, or "traps," in commercial passenger buses that traveled between Mexico and the Chicago area. These buses were housed in at least three warehouses operated by the Vega DTO in Chicago, Illinois, Aurora, Illinois and Batavia, Illinois. Sorto Hernandez was primarily responsible for dismantling the traps in these passenger buses, removing

narcotics from within the traps, and loading narcotics proceeds into the traps when the buses were ready to travel back to Mexico.

In the summer of 2013, at Vega's direction, FIGUEROA received approximately $150,000 in narcotics proceeds from an individual who, unbeknownst to him, was working at the direction of law enforcement (the "CI"). FIGUEROA then delivered these narcotics proceeds to Vega. On September 5, 2013, at the direction of Vega and Arturo Martinez, who FIGUEROA knew was Vega's drug trafficking partner from Mexico, FIGUEROA picked up approximately $263,000 in narcotics proceeds from the CI at a K-mart parking lot located at 3443 West Addison Avenue in Chicago. FIGUEROA placed these proceeds in a trap in a 2001 Acura sports utility vehicle, bearing vehicle identification number 19UYA42621A027383, and delivered the proceeds to Vega.

In or around February 2014, FIGUEROA, Vega, and Sorto Hernandez went to a warehouse in the vicinity of 31st Street and Ashland Avenue in Chicago. There, a commercial passenger bus named "Monarca" had arrived from Mexico. Sorto Hernandez opened the trap in the bus that contained kilogram quantities of narcotics. FIGUEROA then delivered these narcotics to various customers of the DTO.

On April 16, 2014, at the direction of Vega and Martinez, FIGUEROA and Betancourt-Pereira traveled to Individual A's residence in the 2300 block of North Monitor Avenue in Chicago. FIGUEROA knew that Individual A built traps in vehicles for the Vega DTO so that Vega DTO members could conceal and transport

narcotics in these vehicles. At Individual A's garage, FIGUEROA delivered $200 in narcotics proceeds to Individual A and picked up a Chrysler Pacifica, which Individual A had equipped with a trap. Individual A also showed FIGUEROA how to operate the trap from within the vehicle.

On April 26, 2014, at Vega's direction, FIGUEROA, along with Sorto Hernandez, drove a 2001 Acura sedan, bearing vehicle identification number 19UYA42701A011983, to pick up approximately $323,000 in narcotics proceeds from a customer of the Vega DTO. FIGUEROA and Sorto Hernandez then stored these narcotics proceeds in the Acura's trap and transported them to a warehouse located at 850 Ridgeway Avenue, Aurora, Illinois, where they were loaded onto a commercial passenger bus going to Mexico.

On April 27, 2014, at Vega's direction, FIGUEROA met Sanchez and Armando Macias, who was Sanchez's narcotics associate, at Macias's garage in the 4200 block of North Monitor Avenue in Chicago. There, FIGUEROA picked up from Sanchez approximately $47,700 in narcotics proceeds that Sanchez owed to the Vega DTO. Between in or around March 2014 and July 2014, FIGUEROA delivered, on Sanchez's behalf, kilogram quantities of heroin to Macias, from whom Sanchez would later pick up the narcotics, and to one of Sanchez's narcotics customers who lived in a high-rise building in the South Loop neighborhood of Chicago. FIGUEROA delivered a total of approximately 6 to 8 kilograms of heroin to Sanchez's customer in the South Loop. FIGUEROA delivered only kilogram quantities of heroin to Sanchez and Sanchez's customer.

On April 28, 2014, at Vega's direction, FIGUEROA and Sorto Hernandez sorted through kilogram quantities of heroin they unloaded from a commercial passenger bus from Mexico, and delivered approximately 26 kilograms of the heroin to various customers of the Vega DTO.

On June 1, 2014, at Vega's direction, FIGUEROA and Sorto Hernandez unloaded approximately 26 kilograms of heroin from a commercial passenger bus at a warehouse located at 496 South River Street, Batavia, Illinois.

On June 3, 2014, by electronic communication, Vega gave FIGUEROA the telephone number of the individual from whom FIGUEROA was to pick up narcotics proceeds. On June 4, 2014, at approximately 9:21 a.m., FIGUEROA left his residence driving a black Ford Edge, bearing vehicle identification number 2FMDK36C17BB29755. Later that morning, at the Aurora warehouse, FIGUEROA and Betancourt picked up the Chrysler Pacifica and traveled to an alley between North Harding and North Springfield Avenues in Chicago. At that location, FIGUEROA and Betancourt-Pereira met Jose Rodriguez, who exited a Volkswagen sports utility vehicle (the "Volkswagen SUV"). Rodriguez then placed a bag containing approximately $300,000 in narcotics proceeds in a trap in the Chrysler Pacifica. FIGUEROA and Betancourt-Pereira drove the Chrysler Pacifica loaded with these proceeds back to the Aurora warehouse. Later that day, at Vega's direction, FIGUEROA and Betancourt-Pereira again traveled in the Chrysler Pacifica and met Rodriguez in the alley between North Harding and North Springfield Avenues in Chicago. There, Rodriguez placed another bag containing

approximately $300,000 in narcotics proceeds into the trap in the Chrysler Pacifica. FIGUEROA and Betancourt-Pereira drove the Chrysler Pacifica loaded with these proceed back to the Aurora warehouse.

On June 6, 2014, at Vega's direction, FIGUEROA, Sorto Hernandez, and Betancourt-Pereira unloaded approximately 20 kilograms of heroin which arrived that day in a commercial passenger bus at the Batavia warehouse. That same day, in an electronic communication with FIGUEROA, Vega gave FIGUEROA the telephone number for Jose Rodriguez and instructed FIGUEROA to deliver to Rodriguez approximately 20 of the 26 kilograms of heroin that the Vega DTO previously received on June 1, 2014 at the Batavia warehouse. On June 7, 2014, at approximately 11:33 a.m., FIGUEROA and Betancourt-Pereira loaded the Volkswagen SUV with approximately 20 kilograms of heroin. FIGUEROA then drove the Volkswagen SUV to the parking lot of the Westgate shopping center in Aurora, Illinois, where he delivered the 20 kilograms of heroin to Rodriguez. FIGUEROA and Rodriguez then traveled in the Volkswagen SUV to a nearby Walmart store. At the Walmart, FIGUEROA exited the Volkswagen SUV and was picked up by Betancourt-Pereira, who drove a separate vehicle.

Also on June 6, 2014, at Vega's direction, FIGUEROA removed narcotics proceeds from the Aurora warehouse while city officials of Aurora inspected the warehouse. FIGUEROA and Sorto Hernandez took the narcotics proceeds to Individual B's residence for storage and safe-keeping during the inspection of the Aurora warehouse.

7

Between June 7, 2014 and June 8, 2014, at Vega's direction, FIGUEROA and Betancourt-Pereira delivered approximately 17 kilograms of heroin to various customers of the Vega DTO.

On June 10, 2014, FIGUEROA and Sorto Hernandez loaded into the trap of the Chrysler Pacifica approximately 26 kilograms of heroin that arrived in a commercial passenger bus at the Batavia warehouse on June 8, 2014. ~~FIGUEROA~~ and Sorto Hernandez then delivered the Chrysler Pacifica containing the heroin to Individual C.

*[handwritten: MMK FH / Betancourt-Pereira / AF.]*

On June 12, 2014, FIGUEROA delivered approximately 7 kilograms of heroin to another customer of the Vega DTO.

Between June 16, 2014 and June 18, 2014, at Vega's direction, FIGUEROA picked up approximately $230,000 in narcotics proceeds from the customers of the Vega DTO.

During the period of the conspiracy, FIGUEROA and other members of the Vega DTO used a white Acura sedan, with a vehicle identification number 2HNYD18926H536138, to deliver narcotics and pick up narcotics proceeds.

Defendant admits that during the conspiracy, the total amount of narcotics that he possessed with the intent to distribute and distributed, which was reasonably foreseeable to him, was approximately 104 kilograms of heroin. In addition, defendant admits that he personally profited approximately $25,000 from his narcotics-related activities during the conspiracy.

7. The foregoing facts are set forth solely to assist the Court in determining whether a factual basis exists for defendant's plea of guilty, and are not intended to be a complete or comprehensive statement of all the facts within defendant's personal knowledge regarding the charged crimes and related conduct.

## Maximum Statutory Penalties

8. Defendant understands that the charge to which he is pleading guilty carries the following statutory penalties:

a. A maximum sentence of life imprisonment, and a statutory mandatory minimum sentence of 10 years. Pursuant to Title 18, United States Code, Section 3561, defendant may not be sentenced to a term of probation for this offense. This offense also carries a maximum fine of $10,000,000. Defendant further understands that the judge also may impose a term of supervised release of at least five years, and up to a number of years, including life.

b. In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on the charge to which he has pled guilty, in addition to any other penalty imposed.

## Sentencing Guidelines Calculations

9. Defendant understands that in imposing sentence the Court will be guided by the United States Sentencing Guidelines. Defendant understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

10.     For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

a.     **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2015 Guidelines Manual.

b.     **Offense Level Calculations**.

i.     The base offense level is 38, pursuant to Guideline §§ 2D.1(a)(5) and (c)(1), because the amount of heroin involved in the offense for which defendant is accountable is 104 kilograms, which is greater than 90 kilograms.

ii.     Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline § 3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to his ability to satisfy any fine that may be imposed in this case, a two-level reduction in the offense level is appropriate.

iii.     In accord with Guideline § 3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting

the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

    iv.  Based on the evidence now known to the government, the parties agree, subject to the Court's approval, that Guideline § 5C1.2 and Title 18, United States Code, Section 3553(f) are applicable, and that the Court shall impose a sentence without regard to any statutory minimum sentence, and the offense level shall be reduced by two levels, pursuant to Guideline § 2D1.1(b)(17).

    c.  **Criminal History Category**. With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government, defendant's criminal history points equal zero and defendant's criminal history category is I.

    d.  **Anticipated Advisory Sentencing Guidelines Range**. Therefore, based on the facts now known to the government, the anticipated offense level is 33, which, when combined with the anticipated criminal history category of I, results in an anticipated advisory sentencing guidelines range of 135 to 168 months' imprisonment, in addition to any supervised release and fine the Court may impose.

    e.  Defendant and his attorney and the government acknowledge that the above guidelines calculations are preliminary in nature, and are non-

11

binding predictions upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government to conclude that different or additional guidelines provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

11.    Both parties expressly acknowledge that this Agreement is not governed by Fed. R. Crim. P. 11(c)(1)(B), and that errors in applying or interpreting any of the sentencing guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the guidelines. The validity of this Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Agreement, on the basis of such corrections.

### Cooperation

12.    Defendant agrees he will fully and truthfully cooperate in any matter in which he is called upon to cooperate by a representative of the United States

Attorney's Office for the Northern District of Illinois. This cooperation shall include providing complete and truthful information in any investigation and pre-trial preparation and complete and truthful testimony in any criminal, civil, or administrative proceeding. Defendant agrees to the postponement of his sentencing until after the conclusion of his cooperation.

### Agreements Relating to Sentencing

13. At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation. If the government determines that defendant has continued to provide full and truthful cooperation as required by this Agreement, then the government shall move the Court, pursuant to Guideline § 5K1.1, to depart downward from the low end of the applicable guideline range, and shall recommend a sentence that includes a term of imprisonment in the custody of the Bureau of Prisons of 66 percent of the low end of the applicable guideline range. Defendant shall be free to recommend any sentence. Defendant understands that the decision to depart from the applicable guideline range rests solely with the Court.

14. If the government does not move the Court, pursuant to Guideline § 5K1.1, to depart from the applicable guideline range, as set forth above, the preceding paragraph of this Agreement will be inoperative, both parties shall be free to recommend any sentence, and the Court shall impose a sentence taking into consideration the factors set forth in 18 U.S.C. § 3553(a) as well as the Sentencing Guidelines without any downward departure for cooperation pursuant to § 5K1.1.

Defendant may not withdraw his plea of guilty because the government has failed to make a motion pursuant to Guideline § 5K1.1.

15.    It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw his guilty plea.

16.    Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

17.    Defendant agrees that the United States may enforce collection of any fine or restitution imposed in this case pursuant to Title 18, United States Code, Sections 3572, 3613, and 3664(m), notwithstanding any payment schedule set by the Court.

18.    After sentence has been imposed on the count to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining counts of the indictment as to defendant.

### Forfeiture

19.    Defendant understands that by pleading guilty, he will subject to forfeiture to the United States all right, title, and interest that he has in any property constituting or derived from proceeds obtained, directly or indirectly, as a result of the offense; any property used or intended to be used, in any manner or

14

part, to commit or facilitate commission of the offense; and any property involved in the offense.

20.    Defendant acknowledges that on or about December 9, 2014 and January 15, 2015, administrative forfeiture proceedings were commenced against certain property, including (i) a 2001 maroon Acura with a vehicle identification number of 19UYA42621A027383; (ii) a 2007 black Ford Edge with a vehicle identification number of 2FMDK36C17BB29755; and (iii) a 2006 white Acura with a vehicle identification 2HNYD18926H536138.    By signing this plea agreement, defendant acknowledges that he had notice of the administrative forfeiture proceeding, relinquishes any right, title, and interest he may have had in this property, withdraws any previously filed claims, and understands that an administrative decree of forfeiture has been entered, or will be entered, thereby extinguishing any claim he may have had in the seized property.

21.    Defendant agrees to the entry of a personal money judgment in the amount of $25,000, which represents the total amount of proceeds traceable to the offense.    Defendant consents to the immediate entry of a preliminary order of forfeiture setting forth the amount of the personal money judgment he will be ordered to pay.

22.    Defendant understands that forfeiture shall not be treated as satisfaction of any fine, cost of imprisonment, or any other penalty the Court may impose upon defendant in addition to the forfeiture judgment.

23.     Defendant agrees to waive all constitutional, statutory, and equitable challenges in any manner, including but not limited to direct appeal or a motion brought under Title 28, United States Code, Section 2255, to any forfeiture and/or abandonment carried out in accordance with this agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment. The waiver in this paragraph does not apply to a claim of involuntariness or ineffective assistance of counsel. Defendant further agrees not to challenge or seek review of the civil or administrative forfeiture of any property identified in this agreement subject to forfeiture or abandonment, and will not assist any third party with regard to such challenge or review.

### Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Agreement

24.     This Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 14 CR 705-3.

25.     This Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other

federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Agreement.

## Waiver of Rights

26.     Defendant understands that by pleading guilty he surrenders certain rights, including the following:

a.     **Trial rights**. Defendant has the right to persist in a plea of not guilty to the charges against him, and if he does, he would have the right to a public and speedy trial.

i.     The trial could be either a jury trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

ii.     If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

iii.     If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt and that it was to consider each count of the indictment

17

separately. The jury would have to agree unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

        iv.     If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

        v.     At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

        vi.     At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

        vii.     At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

        viii.     With respect to forfeiture, defendant understands that if the case were tried before a jury, he would have a right to retain the jury to determine whether the government had established the requisite nexus between defendant's offense and any specific property alleged to be subject to forfeiture.

      b.    **Waiver of appellate and collateral rights.** Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial. Defendant is aware that Title 28, United States Code, Section 1291, and Title 18, United States Code, Section 3742, afford a defendant the right to appeal his conviction and the sentence imposed. Acknowledging this, if the government makes a motion at sentencing for a downward departure pursuant to Guideline § 5K1.1, defendant knowingly waives the right to appeal his conviction, any pre-trial rulings by the Court, and any part of the sentence (or the manner in which that sentence was determined), including any term of imprisonment and fine within the maximums provided by law, in exchange for the concessions made by the United States in this Agreement. In addition, if the government makes a motion at sentencing for a downward departure pursuant to Guideline § 5K1.1, defendant also waives his right to challenge his conviction and sentence, and the manner in which the sentence was determined, in any collateral attack or future challenge, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness or ineffective assistance of counsel, nor does it prohibit defendant from seeking a reduction of sentence based directly on a change in the law that is applicable to defendant and that, prior to the filing of defendant's request for relief, has been expressly made retroactive by an Act of Congress, the Supreme Court, or the United States Sentencing Commission.

19

27.     Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

### Presentence Investigation Report/Post-Sentence Supervision

28.     Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope, and extent of defendant's conduct regarding the charges against him, and related matters. The government will make known all matters in aggravation and mitigation relevant to sentencing.

29.     Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

30.     For the purpose of monitoring defendant's compliance with his obligations to pay a fine during any term of supervised release to which defendant

is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release to which defendant is sentenced. Defendant also agrees that a certified copy of this Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

### Other Terms

31.     Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

32.     Defendant understands that, if convicted, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

### Conclusion

33.     Defendant understands that this Agreement will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

34.     Defendant understands that his compliance with each part of this Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further

21

understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

35.     Should the judge refuse to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound to it.

36.     Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

37.    Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: _____May 5, 2016_____

ZACHARY T. FARDON
United States Attorney

NICOLE KIM
Assistant U.S. Attorney

ALEXANDER FIGUEROA
Defendant

FRANK HIMEL
Attorney for Defendant