UNITED STATES OF AMERICA
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| | ) | Case No. 14 CR 705-5 |
| v. | ) | |
| | ) | Judge Gary Feinerman |
| | ) | |
| SANTOS WILFREDO SORTO | ) | |
| HERNANDEZ | | |

**Government's Sentencing Memorandum**

The United States of America by its attorney, Joel R. Levin, Acting United States Attorney for the Northern District of Illinois, respectfully submits this memorandum in advance of the sentencing of defendant Santos Wilfredo Sorto Hernandez, regarding the relevant factors under 18 U.S.C. § 3553(a) and the conditions of supervised release.

I. BACKGROUND

A. Proceedings to Date

Defendant was arrested and charged in a multi-count criminal complaint in December 2014, as part of a DEA investigation into the Chicago cell of the Guerreros Unidos drug trafficking organization ("DTO"), led by codefendant Pablo Vega Cuevas. An indictment was subsequently returned against defendant, charging him with conspiracy to possess with intent to distribute and distribute a quantity of heroin, in violation of 21 U.S.C. § 846, (Count 1); possession with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1) (Counts 15, 16, 18, 20, and 21); and distribution of

heroin, in violation of 21 U.S.C. § 841(a)(1) (Counts 14, 17, and 19). Defendant has pleaded guilty to Count 1 by way of a plea agreement.

**B.     Defendant's Offense Conduct**

Detail regarding defendant's offense conduct is set forth in the criminal complaint affidavit, the plea agreement, the Presentence Investigation Report, and the Government's Version of the Offense.

In a nutshell, the government developed evidence that beginning in at least approximately 2012 until September 2014, the drug trafficking organization led by co-defendant Pablo Vega Cuevas (the "Vega DTO") worked with individuals in Mexico and the Chicago area to transport and distribute narcotics that were concealed in commercial passenger buses that traveled between Mexico and Chicago. Vega was the leader of the Chicago cell of the Guerreros Unidos cartel in Mexico. During the investigation, law enforcement intercepted wire and electronic communications of the members of the Vega DTO, including the defendant. The investigation determined that the Vega DTO was responsible for the distribution of least approximately 100 kilograms of heroin on the streets of Chicago and surrounding areas. The defendant was a narcotics courier for the Vega DTO. At Vega's instruction, the defendant worked with co-defendants Alexander Figueroa and Eliseo Betancourt to deliver and pick up narcotics and narcotics proceeds from various customers of the Vega DTO. Defendant dismantled the trap compartments in the passenger buses which had kilogram quantities of heroin secreted in them. Defendant and others unloaded the heroin off the buses, cleaned the buses, and loaded them with money. Defendant also apprised Vega of the condition and quality of the heroin that was unloaded off the

2

buses, and moved narcotics and narcotics proceeds out of the warehouse to other locations in order to evade law enforcement detection.

### C. Guidelines Range

The government concurs with Probation that the advisory Guidelines range for defendant is 135-168 months' imprisonment.

### D. Objections to the PSR

Paragraph 67 of the PSR notes that according to defendant, he has not seen his teenage daughter since 2008. The government submits that this is incorrect. When defendant was arrested at his residence on December 10, 2014, agents found defendant with his daughter who was visiting him from overseas.[1]

## II. SENTENCING CONSIDERATIONS

The Supreme Court has instructed, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range . . . [T]he district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall v. United States*, 552 U.S. 38, 49-50 (2007). The government addresses the relevant § 3553(a) factors below.

### A. The Guidelines and the Need to Avoid Unwarranted Disparities

Among the relevant § 3553(a) factors are the applicable Guidelines range, any pertinent policy statements issued by the Sentencing Commission, and "the need to avoid unwarranted sentence disparities." 18 U.S.C. § 3553(a)(4), (a)(5), (a)(6).

---

[1] The government will provide, under separate cover, the report of defendant's arrest to the Court, defense counsel, and Probation. Paragraph 6 of that report provides the relevant details of defendant's arrest.

Moreover, although the Guidelines are merely advisory, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall*, 552 U.S. at 49.

There are at least two reasons the Court should give serious consideration to the Guidelines. First, the Guidelines are the sole factor in § 3553(a) that provides any objective sentencing range that can practicably promote the overall goal of minimizing unwarranted sentencing disparities. *See United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005) The Supreme Court created the advisory system to "continue to move sentencing in Congress' preferred direction, helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individual sentences where necessary." *Booker*, 543 U.S. at 264-65. The only way to prevent widespread unwarranted disparities is to give serious consideration to the Guidelines. Second, the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall*, 552 U.S. at 46. It is true there is no "presumption" that a Guidelines sentence is the "correct" sentence, *Rita v. United States*, 551 U.S. 338, 351 (2007), and that there is "broad" sentencing discretion post-*Booker*. *United States v. Demaree*, 459 F.3d 791, 794-95 (7th Cir. 2006). Yet the Commission is "a respected public body with access to the best knowledge and practices of penology." *United States v. Goldberg*, 491 F.3d 668, 673 (7th Cir. 2007). Furthermore, the Commission is charged by statute to periodically review and revise the Guidelines as the Commission collects comments and data from numerous sources in the criminal

justice system, and these ongoing efforts to refine the Guidelines are another reason to seriously consider the advisory range.

In the event that this Court exercises its discretion to sentence outside the advisory range, there are guideposts for evaluating what the extent of the deviation should be and when a non-Guidelines sentence will be deemed unreasonable on appeal. These guideposts are set forth in Supreme Court and Seventh Circuit cases. First, the Supreme Court instructs that it is "clear that a district judge must give serious consideration to the extent of any departure from the Guidelines and must explain his conclusion that an unusually lenient or an unusually harsh sentence is appropriate in a particular case with sufficient justifications." *Gall*, 552 U.S. at 46. The degree of the deviation from the advisory Guidelines range is relevant in choosing the particular sentence. The Seventh Circuit has warned that major deviations from the advisory range are more likely to be unreasonable if the grounds for the deviation are "overstated mitigating factors" or "normal incidents" of the offense. *United States v. Carter*, 538 F.3d 784, 790 (7th Cir. 2008). Similarly, the Seventh Circuit admonishes that sentences relying on "common" factors, rather than "particularized" ones, to justify variances are less likely to be substantively reasonable. *Id.*; *see also United States v. Vrdolyak*, 593 F.3d 676, 681-83 (7th Cir. 2010).

### B.     The Remaining § 3553(a) Factors

### *The Instant Offense*

In terms of mitigation, defendant timely admitted guilt and his involvement in the conspiracy. The defendant also participated in successful safety-valve proffers with the government. In aggravation, however, the defendant knowingly became

involved in the distribution of a significant amount of heroin into the streets of Chicago. Defendant is personally responsible for the distribution of approximately 98 kilograms of heroin. That is a jaw-dropping number. And defendant's involvement in drug-related activities goes back to 2012 so the instant conduct was not merely a blip in an otherwise lawful life. Defendant was involved in the charged conspiracy for at least 7 months and his actions allowed the DTO to continue its operations in the Chicago area.

Narcotics trafficking is "a serious crime having a detrimental impact on the community." *United States v. Hayden*, 775 F.3d 847, 850 (7th Cir. 2015). As the Court is undoubtedly well aware, drug trafficking creates very serious harms for the community—including drug addiction, poverty, violence and crimes by drug users to obtain money to pay for drugs, and violence and crimes by drug dealers to protect their territory. The City of Chicago and the surrounding collar counties have been experiencing the fallout from drug activity for far too long, with murder rates and incidents of violent crimes increasing over the years. Defendant's participation in the drug trade directly contributes to this mayhem on the streets of Chicago and the community, and has put the health and safety of citizens of this district in jeopardy. Heroin, as the Court is well aware, is a dangerous controlled substance that results in serious problems for our community. While the defendant did not personally distribute heroin to drug users, his knowing involvement in a sophisticated operation whose sole purpose was to sell vast amounts of heroin that eventually made its way

to the streets is a significant factor to consider when determining the nature and circumstances of the offense.

### Defendant's Proffers with the Government

The government respectfully disagrees with Probation's assessment that defendant's proffers with the government warrant a reduction from the Guidelines. First, defendant's proffers reveal that defendant was involved in drug-related activities prior to the instant case and became involved in this case because of his personal connections to certain individuals in Mexico. The government is not proposing that defendant's sentence be enhanced based on defendant's past history and personal ties. However, defendant's background demonstrates that he is not someone who was unwittingly brought into this drug conspiracy. Defendant knew these individuals and consciously decided to participate in conduct that was dangerous and poisonous to the public. The details defendant provided in these proffers do not constitute mitigating factors and certainly do not justify a more than one-half reduction off the low-end of the applicable Guidelines. Second, while defendant met with the government, the government is not making a § 5K1.1 motion at this time. Thus, defendant should not be credited with any "cooperation" efforts because defendant has not provided substantial assistance to the government that would justify such a significant sentencing reduction. And lastly, a sentence of 60 months, which is what this Court gave to co-defendant Betancourt, would result in a sentencing disparity. Betancourt also safety-valved with the government and provided what information he knew about the DTO and his involvement in it. While

Betancourt did not proffer multiple times, his role in the offense was on a different level than defendant's. Betancourt did not dismantle the trap compartments in the buses and merely unloaded heroin and delivered it to the DTO's customers. In contrast, defendant directly handled the dismantling of the compartments so that the heroin could be unloaded. The handling of the traps was a skill utilized by defendant in connection with the offense – something that Betancourt did not have. Even Probation agrees that defendant, based on his conduct, deserves a higher sentence than Betancourt.

Heroin destroys the fabric of our communities. Given the nature of the offense and the history and characteristics of this defendant, this Court should impose a serious sentence that sends a clear message that the federal court system and our community will not tolerate narcotics trafficking in the Chicago area, even those defendants who merely assist in the distribution of narcotics as couriers.

## C.    Supervised Release Conditions

Although defendant will likely be deported after serving his sentence in this case, the government submits that certain supervised release conditions are appropriate in this case. As the PSR notes, it is unclear whether defendant has temporary protective immigration status and how his immigration case will ultimately be resolved. If for whatever reason defendant is released on bond after surrendering to immigration authorities, there should be additional terms of supervised released imposed to ensure defendant does not recidivate. Therefore, in addition to the conditions proposed by the Probation Officer, the government submits the following supervised release conditions, which are supported by the relevant

§ 3553(a) factors, namely, of protecting the public from further crimes of the defendant, promoting respect for the law, and monitoring defendant's compliance with respect to his immigration-related conditions.

### *Discretionary Conditions of Supervised Release:*

(1)     Provide financial support to dependents if financially able.

(4)     Seek, and work conscientiously, at lawful employment or pursue conscientiously a course of study or vocational training that will equip the defendant for employment.

(17)    Notify a probation officer promptly, within 72 hours, of any change in residence, employer, or workplace, and, absent constitutional or other legal privilege, answer inquiries by a probation officer.

(18)    Notify a probation officer promptly, within 72 hours, if arrested or questioned by a law enforcement officer.

### *Special Conditions of Supervised Release:*

(10)    Pay any financial penalty that is imposed by this judgment that remains unpaid at the commencement of the term of supervised release. The defendant's monthly payment schedule shall be an amount that is at least 10% of his net monthly income, defined as income net of reasonable expenses for basic necessities such as food, shelter, utilities, insurance, and employment-related expenses.

## III.   CONCLUSION

The government respectfully requests that the Court sentence defendant to a term of imprisonment within the advisory Guidelines range and to the supervised release conditions specified by Probation and the government.

Respectfully submitted,

JOEL R. LEVIN
Acting United States Attorney

By:   s/ *Nicole M. Kim*
NICOLE M. KIM
Assistant U.S. Attorney
219 South Dearborn Street, Room 500
Chicago, IL 60604
(312) 353-5300

Dated: June 22, 2017